J-S60045-17

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

IN RE: ADOPTION OF S.R.P., IN RE:   :   IN THE SUPERIOR COURT OF
ADOPTION OF S.G.P., IN RE:       :      PENNSYLVANIA
ADOPTION OF K.D.P.             :
                                      :

APPEAL OF: J.P., NATURAL FATHER   :
                                      :

                                      :   No. 820 WDA 2017

Appeal from the Decree May 9, 2017
in the Court of Common Pleas of Cambria County
Orphans' Court at No(s): 2016-1021,2016-1022,2016-1023

BEFORE: OLSON, DUBOW, JJ., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:         FILED OCTOBER 23, 2017

Appellant, J.P. ("Father"), files this appeal from the decree dated May 3, 2017, and entered May 9, 2017,[1] in the Cambria County Court of Common Pleas, granting the petition of Cambria County Children and Youth Service ("CYS") and involuntarily terminating his parental rights to his minor, dependent daughters, S.G.P., born in July of 2009, and twins, S.R.P.

_____

* Former Justice specially assigned to the Superior Court.

[1] The subject order was dated May 3, 2017, and filed on May 5, 2017. However, the clerk did not provide notice pursuant to Pa.R.C.P. 236(b) until May 9, 2017. Our appellate rules designate the date of entry of an order as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)." Pa.R.A.P. 108(b). Further, our Supreme Court has held that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given." Frazier v. City of Philadelphia, 557 Pa. 618, 621, 735 A.2d 113, 115 (1999).

and K.D.P., born in September of 2011 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[2]  After review, we affirm the trial court's decree.

The trial court summarized the relevant procedural and factual history, in part, as follows:

. . .

3. Services provided by CYS began on July 7, 2013 based upon a report received by CYS on April 11, 2013.  Issues raised concerned lack of parenting skills and supervision, domestic conflict, and inadequate hygiene/poor housekeeping.  After a brief one day Safety Plan with the paternal grandmother on August 30, 2013, the Juvenile Court issued an Emergency Order placing the three children in Agency care and custody.

4. CYS filed a Dependency Petition on August 8, 2013.  After a hearing on September 11, 201[3], the Juvenile Court issued an Order on September 18, 2013 finding the [C]hildren dependent.  In so holding, the Juvenile Court made the following Findings of Fact:

   (a)   Domestic violence and police intervention.

   (b)   Ongoing mental health issues of both parents that directly affected their ability to parent.

   (c)   Unstable housing.

   (d)   Lack of parenting skills.

_____

[2] By the same decree, the trial court involuntarily terminated the parental rights of A.P. ("Mother") with respect to the Children.  Mother did not file a separate appeal, nor is Mother a party to the instant appeal.

5. A Permanency Plan was developed and Permanency Review Hearings were held on January 15, 2014, July 9, 2014, January 26, 2015, September 10, 2015, March 21, 2016, October 26, 2016, and January 19, 2017, with a goal of Parent-Child Reunification.

6. The objectives for the Parent-Child Reunification included the following:

   * If the parents chose to remain separated, both need to obtain and maintain stable housing for a period of six months. They need to ensure that rent and utilities are paid on time and in working order.

   * The parties need to ensure that housekeeping is adequate and the home is free from safety threats to young children.

   * The parents need to participate and complete counseling, including anger management, to help them identify the triggers to their anger.

   * The parents need to develop better coping skills to handle their anger and stress and learn and utilize de-escalation skills for when they become upset and/or angry.

   * The parents need to complete psychological evaluations, including parenting assessments. The parents need to follow through with any and all recommendations from those evaluations.

   * The parents need to cooperate with service providers to learn more effective parenting and supervision skills.

   * The parents must demonstrate their understanding of these skills while attending visits with the [C]hildren.

   * The parents need to restrain [sic] from being in domestic violence situations.

7. The chronology of the progress of the parents to meet these objectives over the six review hearings was as follows:

A. Father – The characterizations went from "moderate" to "minimal" to "no progress" at the last three hearings.

. . .

8. In the Discharge Summary from Independent Family Services, Inc., dated September 30, 2015, the IFS therapist noted:

. . .

[Father] had home visits, community visits, and visits in the [CYS] office. In each location, [Father] would question suggestions made by IFS staff or would not listen to IFS staff. [Father] demonstrated in each location of visits, he was not able to appropriately supervise the [C]hildren. Although the [C]hildren were not harmed during a visit, [Father] had the support of a service provider being present to prevent an injury. [Father] made little progress in the area of discipline and boundary setting. [Father] would argue and go against any recommendations made by service providers. [Father]'s mother, [B.P], would make threats to service providers which would prevent services from working with [Father]. [Father]'s cooperation from the start of services to discharge did not improve. [Father] became more combative with service providers which made it difficult to work with him. IFS staff made attempts to discuss daily schedules, appropriate supervision, positive support systems, nutrition, and expectations of the girls. [Father] would refuse to discuss or incorporate the intervention into a visit. There was not progress made in working with [Father].

. . .

9. On September 9, 2015, the Juvenile Court changed the goal from returning the children to home to adoption, which decision was appealed and eventually affirmed by the Pennsylvania Superior Court.[3]

_____

[3] Father's appeal of the trial court's goal change order was addressed at Superior Court Docket No. 1806 WDA 2015.

10. The [C]hildren, at the time of the filing of the IVT [involuntary termination] Petitions, had been in foster care 37 months.

11. [Father] was evaluated by Dennis Kashurba, a licensed psychologist, who issued a report dated October 18, 2013. Mr. Kashurba, in his conclusions, stated in part:

> The total information available at the present time suggests that it is not likely that [Father] will be able to appropriately parent these three children on an independent basis in the foreseeable future. His admitted addiction to video games and his preoccupation with photography make it unlikely that he will be able to focus enough attention on the [C]hildren other than for a short period of time, such as during visitation today. He appears to possess below average intellectual ability but does seem to recognize his limitations in this regard. Fortunately, he has resumed services through DHS as a payee for his financial benefits. This is probably a good example of how an external agent of control will be necessary for helping him to focus on the [C]hildren's needs as the top priority going forward. . . [.]
>
> . . .

Final Decree, 5/9/17, at 1-6 (unpaginated) (citations to record omitted).

CYS filed a petition to terminate parental rights on November 7, 2016. The trial court held termination hearings on January 30, 2017, March 27, 2017, and April 27, 2017.[4] In support thereof, CYS presented the testimony

---

[4] The court addressed the termination of Father's parental rights at the hearing on January 30, 2017. Due to issues with regard to counsel, the court did not proceed with regard to the termination of Mother's parental rights on this date, Notes of Testimony ("N.T."), 1/30/17, at 37. The termination of Mother's parental rights was subsequently addressed on March 27, 2017 and April 27, 2017.

of Kara Thomas, caseworker, CYS; Sarah Bantly, family resource professional, Independent Family Services ("IFS"); Dennis Kashurba, psychologist, who conducted a psychological evaluation of Father in 2013 and was accepted as an expert;[5] and Kathy Sciafe, supervisor, IFS Home Management Program, Independent Family Services.[6]  Additionally, Father testified on his own behalf.

By decree dated May 3, 2017, and entered May 9, 2017, the trial court involuntarily terminated the parental rights of Father pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[7]  On May 22, 2017, Father, through appointed counsel, filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  Pursuant to order dated June 14, 2017, and entered June 19, 2017, the trial court relied on its decree dated May 3, 2017, and entered May 9, 2017, and did not issue a subsequent opinion.

On appeal, Father raises the following issue for our review:

_____

[5] Mr. Kashurba's report was admitted as Petitioner's Exhibit 12 over counsel for Father's objection.  N.T., 1/30/17, at 128.  Mr. Kashurba additionally served as a member of the IFS treatment team and was, therefore, a party to review of the case on a monthly basis.  Id. at 121, 127.

[6] CYS further presented Exhibits 2, 4 through 13 as it relates to Father.

[7] While the court does not specifically enumerate subsection (b), the court does an analysis related to the Children's best interests and developmental, physical, and emotional needs and welfare.  Final Decree, 5/9/17, at 8-9 (unpaginated), ¶¶ 14, 15.

> 1. Whether the [t]rial [c]ourt erred in terminating the Appellant's parental rights to the subject children, because the Petitioner failed to meet its burden by clear and convincing evidence, including, but not limited to[,] failing to identify how termination of the Appellant's parental rights would impact the [C]hildren[?]

Father's Brief at 3.[8]

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." In re Adoption of S.P., [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." Id. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." Id. The trial court's decision, however, should not be reversed merely because the record would support a different result. Id. at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See In re R.J.T., [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

_____

[8] We find that Father failed to preserve a challenge related to Section 2511(a) and has waived such claims by failing to present argument related thereto in his brief. See In re W.H., 25 A.3d 330, 339 n.3 (Pa.Super. 2011), appeal denied, 611 Pa. 643, 24 A.3d 364 (2011) (quoting In re A.C., 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

In re T.S.M., 620 Pa. 602, 628, 71 A.3d 251, 267 (2013).  "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence."  In re M.G. & J.G., 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted).  "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result."  In re Adoption of T.B.B., 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights.  Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.  One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).  We have defined clear and convincing evidence as that which is so "clear, direct,

weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re C.S., 761 A.2d 1197, 1201 (Pa.Super. 2000) (en banc) (quoting Matter of Adoption of Charles E.D.M., II, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case sub judice, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). In re B.L.W., 843 A.2d 380, 384 (Pa.Super. 2004) (en banc). Here, as Father waived any challenge to the trial court's finding of grounds for termination under Section 2511(a), we analyze the court's termination pursuant to Section 2511(b) only, which provides as follows:

> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

With regard to Section 2511(b), Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa. Super. 2012). In In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.], [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. In re K.M., 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

In re T.S.M., 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." In re K.Z.S., 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." In re Z.P., 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is

nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

In re Adoption of C.D.R., 111 A.3d at 1219 (quoting In re N.A.M., 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

Instantly, in examining Section 2511(b) and determining whether termination of Father's parental rights serves the Children's needs and welfare, the trial court reasoned as follows:

> 14. The [c]ourt must now answer several questions, two of which are, is there a bond between each child and each parent, and what is [in] the best interests of these children. The [c]ourt does believe that there are bonds between the parents and the three children, more so as to the oldest, [S.G.P.]. The twins were very young when removed and are doing well in foster care. As noted in the "Best Interests Statement[,"] "[Father] and [Mother] have failed to show progress in stabilizing their own lives, and it does not appear they are capable of rectifying their situation within a reasonable period of time. [The Children] have been in the care and custody of the agency for 39 months. They need a permanent, committed family that will meet all the needs and provide them with the nurturing, understanding, and stability that they deserve. The parents have demonstrated an inability to perform their parental duties and lack the motivation of performing these duties within a reasonable period of time. It would certainly be in the above-mentioned children's best interests to achieve Permanency through Adoption."

> 15. Based upon the [c]ourt's opportunity that it had to see and hear each parent's testimony, there is no doubt in the [c]ourt's mind that although the parents love their children, they [cannot] provide for them. The [c]ourt believes in terminating the parental rights of these parents. This will best meet the

developmental, physical, and emotional needs and welfare of the [C]hildren.

Final Decree, 5/9/17, at 8-9 (unpaginated) (citations to record omitted).

Father, however, argues that the trial court erred in terminating his parental rights as CYS did not meet its burden as to how the termination would impact the Children. Father's Brief at 7. Father asserts that, despite evidence of a relationship and love between the Children and him, as well as appropriate visits, there was a lack of evidence as to the effect of the termination on the Children, which, pursuant to case law, must be considered. Id. at 14-16. Specifically, Father references the lack of a bonding assessment. Id. at 14-15. Father states,

> In fact, in the Final Decree, issued by the [c]ourt on May 3, 2017, the [c]ourt acknowledged that "there are bonds between the parents and the children;" however, the Petitioners failed to present any evidence to the [c]ourt regarding the emotional and psychological impact on the [C]hildren regarding the termination of those bonds. Furthermore, it was even acknowledged during the hearing to terminate the Appellant's parental rights, that a "relationship" existed between the Appellant and his children.

Id. at 7 (emphasis in original) (citation to record omitted). In addition, Father, while acknowledging his faults, highlights the progress he has made since the Children have been in care. Id. at 17.

Upon review, the record supports the trial court's finding that the Children's developmental, physical and emotional needs and welfare favor termination of Father's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of

the Children's needs and welfare, and as to the existence of a bond between Father and the Children that, if severed, would not have a detrimental impact on them.

Significantly, the Children had been out of parental care and in the same foster care placement for three and one-half years at the time of the January 30, 2017, termination hearing focused on Father. N.T., 1/30/17, at 12-13. CYS caseworker, Kara Thomas, testified that, while she believes Father loves the Children and the Children love Father, a relationship, not a bond, exists between them.[9] Id. at 65-66, 67, 72-73. Similarly, although declining to testify as to the existence of a bond, id. at 112, IFS family resource professional, Sarah Bantly, who supervised visitation between Father and the Children from January 2014 through February 2015, characterized Father as "more of a big brother on a consistent basis than a father figure toward his children." Id. at 110. In so concluding, Ms. Bantly noted the lack of structure and boundaries provided by Father. Id. Both observed that the Children were excited to see Father, id. at 73, 111-12; however, importantly, Ms. Thomas acknowledged a lack of quality

_____

[9] In describing the difference between a bond and a relationship, Ms. Thomas stated, "To me[,] a bond is more, it's harder to separate[,] rather than a relationship is usually a more positive thing." N.T., 1/30/17, at 67. In making this determination, Ms. Thomas references the Children's attitude toward and view of their foster home, as well as Father. Id. at 73.

conversations and interactions during visitation.[10]  Id. at 73.  Moreover, Ms. Thomas testified to improvement in the Children's behavior at home and in school, despite a decrease in visitation.[11]  Id. at 66.  She explained that after a visit the Children would be "hyper," but that this would slowly decline.  Id.

As such, given the length of time the Children had been in care, as well as Father's lack of progress, Ms. Thomas opined that it would be in the Children's best interest to achieve permanency through adoption.  Id. at 55; see also Petitioner's Exhibit 8.  On this topic, Ms. Thomas testified as follows:

> Q.  What do you think is in these children's best interest?
>
> A.  Well, we're looking at [S.G.P.] who is 7, [S.R.P.] and [K.D.P.] who are five years old.  [S.G.P.] came into care and custody at the age of 4.  The twins were two years old.  39 months and an array of at least 20 services have been provided.  I believe that it's in the [C]hildren's best interest to move on for them to be free for adoption.

Id.

While also acknowledging love and affection, psychologist Dennis Kashurba, likewise testified that he could not conclude that the Children

_____

[10] Ms. Thomas confirmed that much of Father's behavior was instead aimed at casting the CYS workers or service providers as the "enemy."  N.T., 1/30/17, at 73-74.

[11] Ms. Thomas related that Father's visitation decreased after the goal change.  N.T., 1/30/17, at 65.

have a bond with Father. Id. at 130. Alluding to Ms. Thomas' testimony, he suggested that there did not exist a "primary emotional bond" between Father and the Children. Id. Mr. Kashurba opined that he supported the termination of Father's parental rights as early as May 2015, almost two years prior. Id. at 126-27, 130-31, 132. Nevertheless, despite recognizing challenges as a result of the delay in seeking termination of parental rights, id. at 126-27, 130-31, Mr. Kashurba related the benefit to the Children. In response to the court's specific concern about the detrimental impact on the Children, in particular due to the delay, Mr. Kashurba was unequivocal and unambiguous as to the benefit and lack of detriment to the Children as a result of termination. Id. at 133-34. The court expressed and Mr. Kashurba explained as follows:

> THE COURT: It just seems ironic that one of the things I'm supposed to consider is whether it has a detrimental effect. Since CYS, according to their testimony, went beyond what they normally would have done to give [Father] a chance, it now becomes that one thing I have to consider among all others is in his favor. That it will be a detrimental effect on his children to terminate his rights because it took so long to do it.
>
> THE WITNESS: No. I don't think it would be detrimental to terminate the parental rights. I think it is beneficial. I think it would have been beneficial, should have been done sooner. I do believe they and CYS did go above and beyond what would be considered appropriate.
>
> My point was that the longer it takes, and I guess it's a situation where we can't let the perfect be the enemy of the good. And so[,] based on what I've heard here today and the information I've been provided with, particularly Mr. Long's description of events[] during the course of those seven visitations after Ms. Bantly had not been the therapist, I think that addresses the chronicity and the severity of the difficulties

- 15 -

that would need to be overcome and would need to have been overcome.

Id. (emphasis added).

Moreover, Ms. Thomas testified that the Children are doing well in their foster home, which is a pre-adoptive resource. N.T., 3/27/17, at 27-29. She expressed, "They're doing very well. They're getting big. [S.G.P.] was only 4 when she came into care and custody, and the twins were only 2. [S.G.P.] is going to be 8. The twins are going to be 5. So they've really grown up. . . ." Id. at 27. Ms. Thomas continued, confirming that the Children are, in fact, "thriving" in this home environment. Id. at 28.

Thus, as confirmed by the record, termination of Father's parental rights serves the Children's developmental, physical and emotional needs and welfare. The testimony presented is clearly sufficient in lieu of a formal bonding assessment. See In re Z.P., 994 A.2d at 1121. Further, the court's exchange with Mr. Kashurba makes clear and directly evidences that the impact of termination on the Children was indeed a part of the trial court's analysis of this issue and a factor with regard to its determination. Regardless of any continuing association between Father and the Children, the record supports severance of this relationship and termination of Father's parental rights in order to allow the Children, who have now been in care a significant portion of their lives, to finally achieve permanence. While Father may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental

rights. Id. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." Id. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." In re B., N.M., 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based on the foregoing analysis of the trial court's termination of Father's parental rights, we affirm the decree of the trial court.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/23/2017